**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF OHIO, OHIO A. PHILIP RANDOLPH INSTITUTE, LASHUNDA LEE, MUNIA MOSTAFA, AUDRIANNA VICTORIAN RODRIGUEZ, and HANNAH TUVELL, | CASE NO. 20-cv-1638 |
| *Plaintiffs*, | JUDGE MICHAEL H. WATSON |
| and | Magistrate Judge Elizabeth Preston Deavers |
| LIBERTARIAN PARTY OF OHIO, | |
| *Intervenor-Plaintiffs*, | |
| v. | |
| FRANK LAROSE, in his official capacity as Secretary of State of Ohio, | |
| *Defendant*, | |
| and | |
| STATE OF OHIO, OHIO DEMOCRATIC PARTY, and OHIO REPUBLICAN PARTY | |
| *Intervenor-Defendants*. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR EMERGENCY
MOTION FOR TEMPORARY RESTRAINING ORDER**

Intervenor State of Ohio begins its response to Plaintiffs' Motion for Emergency Relief on a curious note: elections, it says, "are conducted by statute, not by litigation." But elections are conducted by civil servants and elected officials for the people. And the government officials who conduct elections are subject not only to state laws, but also to federal laws and, most important, the Constitution. This is what this case is about: whether a cramped schedule that state

1

and local election officials themselves acknowledged as infeasible during a public health crisis will be permitted to prevent Ohioans from exercising their most fundamental right when the State's interests would be fully vindicated by allowing more time for the process.

In this reply brief, Plaintiffs will respond not only to the arguments of the Intervenor-Defendant State of Ohio ("State"), but also those of the Defendant Secretary of State ("SOS"), and the other Intervenors and amici curiae, to the extent possible. But we begin with a few overarching premises:

First, as to Plaintiffs' NVRA claim, the State's calling April 28 a "continuation" of the March 17 primary date is untenable. No legal authority exists—and neither the SOS nor the State has cited to any—that allows the General Assembly to post hoc allow voting to resume after an election. If March 17 was the election—despite the State's eleventh-hour closing of every polling place—then no more votes may be cast and counted, and a different constitutional violation will have occurred. If March 17 was not the election—as common sense dictates—then the right to register for the real election continues up until 30 days before that day.

Second, so much of what threatens the loss of Plaintiffs' right to vote is the result of the confluence of the multi-layered absentee ballot process insisted upon by the General Assembly and the constricted schedule in which the General Assembly ordered the entire process must be completed. No one with real experience and qualifications to opine on the issue believes April 28 is a reasonable date: not the Secretary of State, not the county boards of elections, not public health officials. Indeed, the Governor of Ohio has indicated that the public health crisis will still be on the upslope in April. There is no state interest that can justify the disenfranchisement that will result from April 28 date, and, further, no state interest that can justify the demanding sequence of requirements—four to five mailings—that must be completed in this short period.

2

Defendant SOS and Intervenor State have shed no helpful light as to why the General Assembly rejected the SOS's June 2 date for the primary, despite this Court explicitly requesting that the Defendants address this point in its April 2 Order. The SOS expressly deferred to the State on the issue. The State took up the gauntlet, but explained that the different date can be justified because it is "different." Doc. 52, at 19. It then described its election plan as "less time consuming," *id.* at 20, an assertion that is true only because the State cut in half the amount of time that election officials said was necessary to get the job done properly—and, we submit, constitutionally.

Third, there is no preservation of any "status quo" that stands as a barrier to the relief Plaintiffs request. COVID-19 has erased the "status quo" from existence. If relief is granted to Plaintiffs, voters will have ample time to adjust to, say, a late May or early June date, for the primary; that would be far less "confusing" than the whip-sawing that the General Assembly put them through over the past two weeks. Moreover, confusion, if any, would be benign, because to move an election date *into the future* would only cause a voter to get their ballot in early, rather than too late.

Whatever has spurred legislators to adopt such a hurried schedule, it certainly was not the interests of their voters, the people.

## I. PLAINTIFFS HAVE A HIGH PROBABILITY OF SUCCESS ON THE MERITS OF THEIR NVRA CLAIM.

Despite Defendants' semantic contortions, April 28, 2020, is Ohio's current "election" date both under state law and the National Voter Registration Act of 1993 ("NVRA"). Ohio must process registrations submitted 30 days prior to April 28, or whatever date is ultimately set, because Section 8(a)(1) of the NVRA requires Ohio to allow eligible applicants to register to vote in its federal primary election if the application is received "not less[] than 30 days" "before the date of the election," 52 U.S.C. § 20507(a)(1).

### A. Ohio's election currently is set for April 28, 2020.

The Defendants seek to avoid the clear requirements of the NVRA by playing word games. The SOS argues that the "election" was March 17, even though the State neither commenced nor concluded voting on that day, prohibited the *overwhelming majority* of its citizens from voting on that day,[1] has not reviewed the few ballots submitted by that day, and elected no officeholders on that day.

Plaintiffs reiterate the straightforward idea that an "election" is the day on which citizens select individuals to hold public office.[2] Here, the State's own laws establish Election Day as April 28, 2020—the day when ballots are due, and counting will begin. *See* H.B. 197, § (B)(1)-(2) (prohibiting all elections officials from counting or reporting any ballots cast until "7:30 p.m. on April 28, 2020"). H.B. 197 provides that elections officials shall complete the "unofficial count," "canvass of election returns," and other procedures for the federal primary "except that each deadline shall be calculated by adding 42 days" to the March 17 date. *Id.* § 32(G).

Ohio law defines these procedures in terms of their proximity to the Election Day. For example, the unofficial "count, in no event, shall be made later than twelve noon on *the day following the election*." Ohio Rev. Code Ann. § 3505.30 (emphasis added). Similarly, the board of elections "shall complete the canvass [of returns] not later than the twenty-first day *after the day of the election*." *Id.* § 3505.32 (emphasis added).

By extending all of these deadlines by 42 days, the State now treats April 28 as the election. Voting will overwhelmingly cease on April 28, counting of ballots will begin on April 28, and

---

[1] Per a brief submitted by the Secretary in the Ohio Supreme Court, "nearly 85% of voters still vote on election day." *See* Merit Br. of Respondent Ohio Secretary of State Frank LaRose, *State ex rel. Ohio Democratic Party v. LaRose*, No. 2020-0388, at 12 (Ohio Sup. Ct., filed Mar. 25, 2020).
[2] This is not only common sense, but also the literal definition. *See Elect*, American Heritage Dictionary of the English Language (5th ed. 2020) ("To select by vote for an office."); *Election, id.* ("The act or process of electing someone to fill an office or position" or "an instance of this.").

officials will begin reporting results on April 28. Even H.B. 197 itself implies that April 28 is the election: it extends eligibility for "uniformed services and overseas" voters' ballots to May 8, 2020, H.B. 197, § 32(E)(3). These voters would certainly not have been prejudiced by the closure of physical polling places on March 17. Extending the deadline for them makes no sense unless the State views April 28 as Election Day.[3]

Given that the State treats April 28, 2020, as the election date for every other relevant deadline, April 28 must also constitute Election Day for the procedure of registration. The fact that no Defendant has even tried to offer a practical reason for treating registration differently from these other deadlines only highlights the absurdity of their position.

---

[3] H.B. 197 also treats April 28 as Election Day in other ways. For example, H.B. 197 sets the deadline for submitting absentee ballot applications as noon on April 25 (the Saturday preceding the election), except for those disabled and confined voters who qualify to request a ballot up to 3 p.m. on April 28 pursuant to Section 3509.08 of the Ohio Revised Code. H.B. 197, § 32(C)(3). H.B. 197 also requires absentee ballots be postmarked, if mailed, "on or before April 27" and received "not later than May 8," or returned "at the office of the appropriate board of elections not later than 7:30 p.m. on April 28," *id.* § 32(E)(2), and it requires that people eligible to vote in person be permitted to cast a ballot so long as they are in line by 7:30 p.m. on April 28, *id.* § 32(D). These are the rules applied to Election Day in Ohio. *See, e.g.*, Ohio Rev. Code Ann. § 3509.03(D) (noting that the deadline for applying for an absentee ballot is "not later than twelve noon on the third day before the day of the election at which the ballots are or be voted"); *id.* § 3509.08(B) (noting that the regular absentee ballot request deadline is extended for "any qualified elector who is unable to travel to the voting booth in the elector's precinct *on the day of any general, special, or primary election*" until "three p.m. *on the day of the election*") (emphasis added); *id.* § 3509.05(B)(1) (noting that absentee ballots sent via mail will be counted if they are "postmarked prior to the day of the election" and "delivered to the director *prior to the eleventh day after the election*") (emphasis added); *id.* § 3509.05(A) (noting absentee ballots not delivered by mail must be "delivered to the director not later than close of polls on *election day*") (emphasis added); *id.* § 3501.32 (noting that "on the day of the election the polls . . . shall be closed . . . at seven-thirty p.m., unless there are voters waiting in line to cast their ballots, in which case the polls shall be kept open until such waiting voters have voted"); *see also* Ohio Sec'y of State, *Election Official Manual*, ch. 6, 5-5 ("If an absentee ballot does not have a postmark, it must be received by the board of elections *no later than 7:30 p.m. on Election Day.*") (emphasis added). Finally, H.B. 197, § 32(E)(3) provides that mail ballots cast by military and overseas voters pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, ("UOVACA") received by the board of election after 7:30 p.m. on April 28, 2020, and not later than May 8, 2020, are eligible to be counted "if they were submitted for mailing not later than 12:01 a.m. at the place where the voter completed the ballots on April 28, 2020, regardless of whether the ballots are postmarked." These categories of voters would have been able to cast their votes by mail before March 17, and would not have been affected by the State's prohibition on in-person voting that day. If the election date were truly March 17, then there would be no reason for the state to extend Election Day to UOCAVA voters. The fact that it did so reinforces that Mach 17 was not Election Day.

**B. The NVRA Requires the Election be Interpreted as April 28, or Whatever Date Is Eventually Used for the 2020 Primary Election.**

The NVRA demands this Court adopt Plaintiffs' interpretation. Congress's authority to regulate federal elections under the Elections Clause, U.S. Const. art., I § 4, supersedes the states' power to regulate their elections, and the NVRA is a valid exercise of this authority. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 4 (D.C. Cir. 2016). No party disputes this. Nor does any party dispute that the NVRA was designed to "increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1).

In light of the NVRA's superseding authority and its explicit purpose to increase registration, the Sixth Circuit has indicated that courts should not defer to narrowly construed, state-law election terms when adjudicating alleged NVRA violations because allowing states to impose crimped state-law definitions would "frustrate the NVRA's purpose" and let states "completely ignore . . . the NVRA." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 383 (6th Cir. 2008).

Defendants now seek to do exactly that, by proffering a narrow state-law definition of "election" with no explanation of how that definition comports with the NVRA's structure or purpose, or even other aspects of state law. Despite Plaintiffs' previous explanation of this point, *see* Plaintiffs' Memorandum in Support of a Temporary Restraining Order, Doc. 4 at 14-15, no Defendant rejects the applicability of *Land*, nor attempts to square Ohio's *70-day* prohibition on registration with the NVRA's requirement to allow registration up to 30 days before an election. *See* Defendant State of Ohio's Opposition, Doc. 52; Defendant LaRose's Memorandum in Opposition, Doc. 44; Intervenor-Defendant Ohio Republican Party's Memorandum, Doc. 43 (all

omitting any discussion of *Land*). Nor can they. The NVRA is clear: the election is April 28, 2020. Otherwise, the State would frustrate the NVRA's purpose of maximizing registrations.

Defendants' implicit tautology—that an election is whatever day state law says because state law says it—would admit absurd scenarios like barring new registrations for a *full six months* by articulating a supposed *de jure* primary "election" on February 1 and then moving the *de facto* election to August 1. This would nullify the NVRA's promise of voter registration protection.

### C. Attempts to distinguish or distort precedent are incorrect or inapposite.

Defendants attempt to cast and recast various precedents to suit their needs. These attempts are unavailing.

First, Plaintiffs cited *Georgia State Conference of the NAACP v. Kemp* and *Arizona Democratic Party v. Reagan* for the proposition that courts "find the NVRA violated where state registration deadlines extend more than thirty days before an election." Doc. 4, at 14. Defendant LaRose asserts that *Kemp* does not support this proposition, Doc. 44 at 17, but the *Kemp* court in fact found a likely violation of Section 8(a)(1) of the NVRA and granted a preliminary injunction. *See Kemp for Georgia*, No. 1:17-CV-1397, 2018 WL 2271244, at *1 (N.D. Ga. Apr. 11, 2018) (reciting these facts). No final merits ruling was issued only because the parties settled in a consent decree that recapitulated the NVRA's 30-day registration deadline. *Kemp*, No. 1:17-cv-1397 (N.D. Ga. Oct. 17, 2017), Consent Decree, ECF No. 42, at *2–3; *see also* Defendant State's Brief, Doc. 52, at 12 (indicating Georgia's deadline violated the NVRA because its election fell within the NVRA's definition of election).

Second, Defendant State attempts to distinguish *Reagan* as "inapposite" only to recognize that the state "close[d] its registration deadline one day early" and "[t]he Court ruled that" this "technically violated the NVRA." Doc. 40-1 at 12. While *Reagan* may not have defined "election,"

it demonstrates that the NVRA prohibits a deadline even one day too early, to say nothing of Ohio's deadline 40 days too early.

Third, Defendant State points to New York's laws affecting its registration deadline after it postponed its primary in the wake of the September 11, 2001, attacks. Doc. 40-1 at 11-12. But the scheme is inapposite: no Court ever reviewed those laws' validity under Section 8 of the NVRA.[4]

As the NVRA, precedent, common sense, and Ohio's own statutory scheme all indicate, the election is on April 28, 2020.

## II. PLAINTIFFS HAVE A PROBABILITY OF SUCCESS ON THEIR CONSTITUTIONAL CLAIMS

### A. The Burdens Fall More Heavily in this Case than in *Mays* or *Obama for America.*

The burdens in this case fall heavily on all voters in Ohio who had not voted by March 16. The State's argument that Plaintiffs' opportunities to vote early "before March 17" factors into "an even lower burden," State Br. at 15, than in *Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020), is disingenuous. This Court need not take Plaintiffs' word. It can take the word of the SOS himself, who, in his reply brief filed with the Sixth Circuit in *Mays v. Larose*, explained the circumstances in which election law restrictions may be described as "severe." In responding to the *Mays* plaintiffs' argument that, if the SOS were right, he could be free to abolish Election Day voting, without warning, the day before polls were to be open, the SOS objected to the mere suggestion:

> The Secretary has never made so extreme an argument. His point is, and always has been, that Ohio does not "outright deny" anyone the right to vote, since everyone affected by the Saturday-noon deadline can plan ahead and vote early if they fear being unavailable on Election Day. *That logic would not extend to a case in which*

---

[4] Similarly, Defendant State's hypothetical that a one-hour extension at polling place would require a corresponding one-hour shift in registration deadlines is incorrect for the simple reason that the NVRA counts in terms of days, not hours. *See* 52 U.S.C. § 20501(a)(1) (mandating registration applications be accepted not less than "30 days" "before the date of an election"). Even if this hypothetical close case of minutes or hours mattered, this Court need not consider it in the context of Ohio's vast, 70-day deadline.

> *the State changed the rules midstream, abolishing Election Day only once it was too late to vote early. By denying voters any notice of the change in rules until it was too late to comply, the State would "virtual[ly] exclu[de]" anyone who relied on those rules from voting, severely burdening the right to vote.*

SOS Reply Br., *Mays v. LaRose*, No. 19-4112, Doc. 35, at 11 (Exh. 1 hereto) (citation omitted) (emphasis added).

That is precisely what happened here. Unlike the plaintiffs in *Mays*, Plaintiffs here did not have notice of the "change in rules until it was too late to comply." Plaintiffs did not know that they had to vote earlier in order to avoid the changes in the rules. Thus, under the SOS's own reasoning, if those changes threaten Plaintiffs' exercise of their franchise, as it does here, the burden is "severe."

These burdens fall much heavier and wider than those in in *Mays*. The burdens in this case are also much more severe than those in *Obama for America v. Husted*, 697 F. 3d 423 (6th Cir. 2012), where the Sixth Circuit considered the cut-back of three days of early voting as "not severe," but above "slight." 697 F.3d at 433.

## B. Defendants Ignore the Cumulative Impact of the Burdens on Voters.

Both the State and the SOS attempt to dilute the collective effect of H.B. 197's burdens by parsing each particular aspect of them independently of each other. In doing so, they miss the big picture: the State's multi-step, complex, vote-by-mail-only process which election officials and voters must complete in less than a four-week period leading up to April 28, against the backdrop of the greatest public health crisis this country has faced in over a century.[5] *See Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) ("panoply" of burdens should be viewed together in right-

---

[5] Defendants suggest Plaintiffs exaggerate the extent of this multi-stage process, Doc. 52 at 15, but the SOS's own fact witness describes the relief requested by the Ohio Democratic Party—which skips the initial postcard and instead would send every voter an absentee ballot application, so is in fact more streamlined—as a nine-stage process, with seven of the nine stages essentially identical to the process laid out in H.B. 197. Grandjean Decl., Doc. 44-2, ¶ 35.

to-vote case). The Sixth Circuit has held that while certain "requirements may only impose a reasonable burden on constitutional rights," the proper analysis looks at "the combination of these laws," which taken together can constitute "a severe burden." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 595 (6th Cir. 2006).[6]

Although Defendants criticize Plaintiffs' fears as speculative, Plaintiffs have supported their claims with detailed declarations as to the problems voters have already experienced and why it is likely that they will experience similar problems in the 25 days left before the primary election date. Indeed, Defendant LaRose's *own declarant* indicates boards of elections may be even *less equipped now* than they were when they first said April 28 was infeasible because they are now "operating without full staffs" "[d]ue to COVID-19." Grandjean Decl., Doc. 44-2, ¶ 9. If anything is "speculative," it is the State's wishful thinking that it can hold a fair, inclusive, and constitutional election on April 28 that allows all those who wish to vote to participate.

Theoretically, as the State would have it, a voter need not wait to receive the SOS's postcard to begin the absentee-ballot voting process, Doc. 52, at 15. Instead, the voter might independently request an absentee ballot. This ignores the reality that many voters do not today know that they have to request an absentee ballot: Plaintiffs have fielded calls from voters who believe that their boards of elections will automatically mail out ballots to them. Ex. 2, Suppl. Miller Decl. ¶¶ 2, 4. Next, in the State's imagination, if a voter cannot download and print an absentee ballot application, the voter could call their potentially understaffed board of election to request an application (State Br. at 16), or perhaps write down "all the information that must be

---

[6] *See also Libertarian Party of Ohio v. Husted*, No. 2:13-cv-953, 2015 WL 12967768, at *9 (S.D. Ohio Mar. 16, 2015) (holding that the "aggregate effect" of election law requirements "severely burdened associational rights"); *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1219–20 (holding the court "must address the burdens the law poses collectively" as it cannot "parse out" the requirements that "in the aggregate impose an undue burden").

included" in an application (without mistake), and mail it to their board, *id*.[7] Then, in order to mail the absentee ballot application, the voter, who is unlikely to have postage at home, would either have to order stamps online and wait as long as a week for them to arrive, or go outside—against a stay-at-home order—to buy stamps "at post offices, shipping centers, supply stores, grocery stores, and ATMs." State Br. at 17. Then, the State assumes that, in this new COVID-19 universe, the boards of election and the post offices would work with precision to ensure that every absentee ballot application is processed immediately, every absentee ballot is mailed out, and every absentee ballot is mailed back and received in the 25 days left before Election Day,[8] despite postal workers and election officials being taken sick, despite stay-at-home orders, despite print shops that sell postage being closed, and despite voters' fears that they cannot leave their homes. Voters' constitutional rights should not be made contingent on such an absurd chain of speculative fantasy. And, most important: what is the State's possible justification for burdening voters with such a cumbersome, time consuming process within this 25-day period in the middle of this public health crisis?

### C. The Defendants Do Not Sufficiently Justify the Burdens Imposed.

---

[7] It should also be noted that the idea that a voter can write down the information on a piece of paper and submit it to request an absentee ballot, rather than using the absentee ballot application is not a new accommodation the Secretary has made to address the present circumstances—rather this is provided for in the Ohio Revised Code and had been the rule for years, *See* Ohio Rev. Code Ann. § 3509.03(B) (noting that an "application need not be in any particular form" but needs to contain the information outlined on the absentee ballot application). None of the Defendants indicated how frequently electors have submitted handwritten absentee ballot applications or how frequently there are deficiencies in those applications.
[8] Secretary LaRose estimated, on March 25, that "it is expected that the[] postcards [H.B. 197 requires be sent] will reach registered voters in the second week of April." Press Release, LaRose Issues Statement on Legislation Finalizing Ohio's Primary, Mar. 25, 2020, https://www.sos.state.oh.us/media-center/press-releases/2020/2020-03-25/; *see also* H.B. 197, § 32(C)(2) (noting that the postcards are being sent to each registered elector "notify[] the elector of the methods by which the elector may obtain an application for absent voter's ballots, the procedures and deadlines to apply for absent voter's ballots . . ., and the procedures and deadline to return voted ballots to the office of the board of elections"). This would be the first of many mailings. And, as the Ohio Association of Election Officials noted, "[t]he postal service advises that it takes 3-5 days for mail to reach its destination," Doc. 4-5, at 1. All this is assuming that operations proceed as they do in normal circumstances.

These severe burdens must be justified by a compelling state interest to survive the appropriate application of strict scrutiny. Even in *Mays* and *Obama*, where the court characterized the burdens as "moderate" (in *Mays*) or somewhere between "slight" and "not severe" (in *Obama*), the Sixth Circuit held the state to proof that its precise interests were at least "necessary" to burden the plaintiffs' rights. *Obama*, 697 F.3d at 433; *Mays*, 951 F.3d at 784.  Neither the State nor the SOS has demonstrated any such necessity for the burdens here.

First and most important, neither the State nor the SOS has explained why it was "necessary" for the General Assembly to set April 28 as the primary day, despite warnings from both the SOS and county election officials that it would be difficult, if not impossible to prepare for the election on that day.[9] The compressed schedule required by an April 28 election actually undermines the interests the State articulates at pages 18-19 of its brief. Far from "minimizing disorder and easing the burdens on the boards of elections," the timeline set by H.B. 197 puts incredible pressure of elections officials, as they themselves noted in objecting to the infeasibility of the April 28 date. Doc. 52 at 18. The State also claims an interest in "concluding the March 17 primary as expeditiously as possible, while ensuring that everyone who was eligible to vote on March 17 can vote." *Id.* at 19. There can be no interest in disenfranchising those eligible to register and vote in the rescheduled primary under the NVRA. Moreover, the current timely will not ensure all eligible voters can vote, because it is too constricted for elections officials and the Post Office to ensure mail ballots are available in time to be cast.

---

[9] Defendants briefs emphasize that H.B. 197 was passed unanimously. However, that the General Assembly unanimously adopted the new election date does not fill the gap in explaining why it did so. Indeed, members of the General Assembly are themselves on the primary ballot, and closing the election process as quickly as possible may have been seen as in the self-interest of persons on both sides of the aisle. In addition, the election change was just one part of an overall coronavirus package with urgently needed relief for the state, and even legislators with strong misgivings about the election provisions would have been hard-pressed to cast a "nay" vote in these circumstances.

Despite this Court expressly asking the SOS and the State to address the issue of why the General Assembly chose April 28 as the primary day over the SOS's set date of June 2, neither party did so. The SOS expressly "defer[red] to the Intervener, the State of Ohio, for an express response to this Court's order to describe the State's interests in implementing the aspects of H.B. 197 pertaining to the election," Doc. 52 at 11.

The State failed to respond to this subject in its brief. Certainly, the State purported to respond, State Br. at 18–19 n. 12, but its explanation reduces to the fact that the General Assembly's plan and the SOS's plan were "fundamentally different." *Id*. at 19. The SOS's plan, while not perfect, would have at least placed an absentee ballot application in the hands of every voter who had not yet voted. LaRose Letter to Legislators, Doc, 4-4. The General Assembly's plan instead places the burden on the voter to ask for the application, increases the number of mailings, and more than halves the time to get all of this done.

That the State self-servingly describes this as "more streamlined, and less time consuming" is neither completely true nor sufficient justification. *Id*. at 20. Mere administrative convenience cannot justify abrogating the fundamental right to vote. *See, e.g.*, *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) ("it would be nonsensical" to prioritize legislative deadlines, set for convenience, over the fundamental right to vote); *Carrington v. Rash*, 380 U.S. 89, 96 (1965) ("States may not casually deprive a class of individuals of the right to vote because of some remote administrative benefit to the State."). It is a fortiori "less time consuming" only because the General Assembly set a much earlier primary date than did the SOS, making it immeasurably more difficult to complete all necessary actions in the time allotted . And it is not "more streamlined," unless the State is counting on its process to reduce voter turnout.

Creating a more burdensome, "less time consuming" process is, in fact, at the core of the loss of the right to vote. It is common sense that the more steps that a voter is required to take in order to vote, the less likely it is that the voter will vote. Sending the voter a ballot without the need for an application—as is done by every vote-by-mail state that requires voters to register—insures that the greatest number of voters will vote. Adding a step of first sending every voter an application directly reduces somewhat the odds that the voter will vote. Adding a third step of first sending the voter a postcard, informing the voter that they must ask for an application in order to get a ballot reduces the odds even more. And it is this last option that the State—without justification—chose to implement. These burdens are compounded by the State's constitutional error in forcing the voter to take all of these steps in an unconscionably short period of time, under the circumstances of the current public health crisis.[10] That is the essence of Plaintiffs' constitutional claim.

### D. Defendants' and Amici's Criticisms of the Requested Relief Either Misconstrue the Requests or Are Easily Dismissed.

The relief sought by Plaintiffs has been misconstrued in multiple briefs filed in this case. Plaintiffs' requested relief seeks to effectuate the State's move toward a predominately vote-by-

---

[10] Other states that have moved to virtually all mail elections have given themselves more time or sped up the process of getting ballots into the hands of voters. For example, on March 24, Nevada announced that it would conduct its June 9 primary primarily by mail and that it would send absentee ballots directly to all registered voters. Press Release, *Secretary Cegavske Announces Plan to Conduct the June 9, 2020 Primary Election by All Mail* (Mar. 24, 2020), https://www.nvsos.gov/sos/Home/Components/News/News/2823/309. Michigan's governor announced on March 27 that it would send absentee ballots to new registrants and absentee ballot request forms to all registered voters and for the March 5 state elections. *Governor Whitmer Signs Executive Order Expanding Absentee Voting in May 5 Elections*, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-523402--,00.html. On April 1, West Virginia moved its primary from April 12 to June 9, and the state is sending absentee ballot applications to all registered voters. *West Virginia Launches Plan to Send Absentee Ballot Applications to All Voters*, WHSV.com (Mar. 26, 2020), https://www.whsv.com/content/news/West-Virginia-launches-plan-to-send-absentee-ballot-applications-to-all-voters-569129731.html.

mail election in light of the dual constraints of the time limitations imposed by the General Assembly and the public health crisis.

First, in the declaration that the State submitted from Karla Herron, Director of the Delaware County Board of Elections,[11] Ms. Herron incorrectly states that if Plaintiffs' requested relief is granted, the county "will have to scramble to find polling locations." Herron Declaration, Doc. 52-2, ¶ 19. Nothing in Plaintiffs' requested relief requires counties identify and operate polling locations. Rather Plaintiffs request only a modest expansion of in-person voting options only at boards of elections. *See, e.g.*, Doc. 4 at 1-3.

Second, the Honest Elections Project incorrectly asserts that "Plaintiffs ask that anyone be permitted to vote in-person, provided they bring an unmarked absentee ballot with them to the polls or vote a provisional ballot." Doc. 51 at 14. This grossly mischaracterizes Plaintiffs' requested relief. Plaintiffs ask that disabled electors who qualify to vote in-person under Section (D)(1)(a) of H.B. 197 be able to cast a regular ballot in person if they bring their absentee ballot mailing *to their local board of elections*.[12] Doc. 4 at 2 (number 4). In addition, Plaintiffs request that voters who *do not* receive their ballots in the mail be permitted to vote a provisional ballot in person at their local board of elections.[13] *Id.* (number 5).

Finally, the State alleges that "Plaintiffs here ask this court to upend this system completely *for just fourteen days*." Doc. 52, at 3 (emphasis in original). Plaintiffs did not request a specific date—rather, Plaintiffs noted that the process set forth by the State is one that Ohio's election administrators warned could not be completed by April 28. Plaintiffs suggest a more simplified

---

[11] This was the only declaration submitted from any member of the boards of elections in Ohio's 88 counties.

[13] The Secretary notes that "H.B. 197 does not allow for this contemplated group of individuals to arrive at the designated polling places on April 28 to cast provisional ballots in person." Doc. 44, at 27.

process, building on the procedures used in other states that predominately conduct elections by mail, and ask that whatever relief the court grants it set a date that will allow Ohioans a meaningful opportunity to participate in the election. Doc. 4 at 2 (number 7).

In this context, Plaintiffs address the SOS's more specific responses to the relief requested by Plaintiffs:

Relief Request 2:[14] An order mandating, at least 21 days prior to the close of polls for the 2020 primary election, county boards of elections shall mail all registered electors who have not already voted in the election a primary ballot for each party with candidates on the ballot, return postage pre-paid, with instructions to cast only one ballot and return the ballot in the official pre-paid postage envelope.

The SOS complains that too many ballots will have to be printed, noting—interestingly—that Ohio counties "do not have anywhere near" enough envelopes to accommodate the mailing.[15] Doc. 52 at 21. Because only one envelope would be sent to each voter, under either Plaintiffs' suggested process or the State's, this means that, even if every voter exercised their right to request an absentee ballot under the State's process, the counties could not meet that demand. Obviously, the State is not prepared for this primary—at least not for an April 28 primary date. It is not far-fetched to predict that there will be a much higher than usual absentee vote, as virtually all voters are staying at home.

And again, both the State and the SOS miss the larger point. The State is already prepared to mail 7.8 million postcards to voters, at an estimated cost of 2.4 million dollars.[16] If voters ask for applications to be sent by phone, because they cannot download and print out the application

---

[14] The response to the SOS as to Relief Request (1) is addressed in the NVRA section.

[15] Even here, the State exaggerates the number of ballots necessary, claiming that they would need to print 7.7 million Libertarian ballots, Doc. 51, at 21, when in fact Libertarians have primary candidates on the ballot in only 6 of Ohio's 16 congressional districts, representing just 37% of the population. Vote Free, Ohio!, https://votefreeohio.com/2020-libertarian-candidates/.

[16] Sec'y of State, Press Release: Postcard Mailings, (Apr. 4, 2020), https://www.sos.state.oh.us/media-center/press-releases/2020/2020-04-02/.

or write it out in longhand, then there will be another mailing costing untold dollars. Mailing out the ballots themselves will cost additional dollars to the State. And, voters themselves will have to potentially spend a total of thousands of dollars in postage to mail in their applications. But Plaintiffs' process calls for only one mailing by the State and a pre-paid mailing back of the ballot by voters.[17] It is simpler, potentially less expensive, and the only process that is certain to be accomplished in the short time given the voters by the legislature.[18]

Nor is there a basis for the naked claim of administrative burden. Prior to the 2012, 2014, 2016, and 2018 general elections, the Secretary has mailed absentee ballot applications to every active registered voter, Grandjean Decl., Doc. 44-2, ¶ 15, and in 2018, these applications were even pre-filled with the voter's name, current address, and local voter identification number. *Id.* ¶¶ 23-25. Mailing ballots instead of applications is even easier. Further, in this primary, election administration costs should be reduced compared to past elections, because there will be a severe reduction of costs associated with open polling places, fewer to no poll workers, and no operating costs.[19]

The SOS's claim that voters would likely be confused by receiving as many as four ballots is unsubstantiated. Any potential for confusion is easily addressed with a clear instruction that the

---

[17] The mailing of pre-paid absentee ballots (and provisional ballots) is already a cost allotted for in H.B. 197, H.B. 197, § 32(C)(6)-(7), and the state must be prepared to sent pre-paid ballots to every qualified and registered voter who requests one.

[18] We note that neither the State nor the SOS has attempted to justify the failure to pre-pay the postage on the absentee ballot application, with the State arguing that "stamps are widely available for purchase online and at post offices, shipping centers, supply stores, grocery stores, and ATMs." (State Br. at 17). But the State does not explain how someone without internet or printer access can purchase a stamp "online," and how people who are ordered to stay home can go out to buy stamps. In addition, the State fails to account for the fact that someone who orders stamps online at the postal service will have to wait at least 3–5 business days for those stamps to arrive.

[19] Mass. Institute of Tech., *Vote By Mail Reform Memo*, (Nov. 2013), http://web.mit.edu/supportthevoter/www/files/2013/11/Vote-by-Mail-Reform-Memo.pdf (noting that academic studies concluded that if Colorado sent all registered voters ballots by mail the state could cut costs by $1.05 per registered vote, and that despite an initial investment of $1.5 million by the state over two fiscal years, this program could save Colorado's counties $5 million over the same period).

voter should return only one ballot. In fact, the existing envelope for absentee ballot requires that the voter check off which party ballot the voter is casting.[20]

The State's claim that providing multiple ballots would increase the chance for voter fraud ("someone else filling out a voter's unused ballots"), State Br. at 18, makes no sense. A voter will receive only a single official envelope and must return her ballot in its official envelope, which requires specific identifying information; so, an unused ballot without an associated envelope could not be used effectively. *See Northeast Ohio Coal. for the Homeless v. Husted*, 837 F. 3d 612, 632 (2012) (rejecting State's claim that requiring perfection in absentee ballot information prevents fraud and finding that "[y]et some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh")

Finally, neither the SOS nor the State explain why they are not able to undertake vote-by-mail the same way most other vote-by-mail-only states do: by sending ballots to all voters. This includes Colorado, which has an open primary; it has a process under which it sends ballots of all parties to unaffiliated voters.[21]

If the Court nonetheless finds this relief too burdensome on the State, an alternative is to require the state to mail to the voter a single ballot for the party in whose primary the voter last participated and multiple ballots only to unaffiliated voters. This is acceptable as long as any voter

---

[20] This fact resolves the complaint of the Ohio Democratic Party that it needs application forms to be sent out in order to track affiliated voters. ODP Br. at 8–9. That information is available from the envelopes. Further, in-person voters in Ohio are free to choose any party ballot, so the information ODP seeks would in any event not be available to it under normal circumstances for the vast majority of voters until after the election. The relief Plaintiffs' seek provides voters with the same choices they would be presented at the polls.

[21] The State's only response to the Colorado example is that Colorado "specifically legislated for the possibility that voters would return multiple ballots." State Br. 15 n. 10. But the issue is not whether Ohio's law is different. We are in court, *because* it is different. The issue is whether Ohio's law is part of a sufficient justification of the entire process adopted by the General Assembly that threatens to burden Plaintiffs' right to vote unconstitutionally.

can call or email her county board of elections to request a different ballot, in order to preserve Ohio's distinctive primary system in which any voter can choose to vote any party ballot. This alternative would place a lower burden on the state—substantially reducing the number of ballots printed and mailed—but somewhat increase the burden on voters who wish to vote in a different party's primary than last election.

Relief Request (3): An order mandating that any elector who has not received a mail absentee ballot at least 14 days prior to the close of polls for the 2020 primary election may submit a request for such a ballot to their local board of election by phone.

The SOS argues that telephone requests would eliminate "voter verification safeguard." Doc 52. at 22. But the only voter information that cannot be provided over the telephone is the voter's signature to an affidavit, and the absentee ballot itself also requires a signature, which must be checked by election officials to verify that the voter's ballot is eligible to be counted. *See* Ohio Rev. Code Ann. § 3509.03(B). Thus, a signature safeguard remains.

Relief Request: (4) An order mandating that any elector who qualifies for in-person voting pursuant to H.B. 197, § 32(D)(1), and who received a mail absentee ballot, can vote a regular ballot in-person ballot [sic.] if they bring their absentee ballots to their local board of election.

The SOS misunderstands this request. *See* Doc 52. at 23. Plaintiffs are requesting that, *if* this Court orders that boards of elections to automatically send all eligible voters who did not vote in the March 17 election absentee ballots, then boards should provide the in-person *regular* voting option to voters with recognized disabilities who need assistance casting a ballot. This small adjustment would be necessary because, under current Ohio law, voters who requested and received an absentee ballot but decide to vote in person are given only provisional ballots. Ohio Rev. Code Ann. § 3505.181(A)(3).

Relief Request (5): An order mandating any elector who does not receive their mail absentee ballot prior to the postmark date for mail absentee ballots shall be permitted to vote a provisional ballot in person at their local board of election.

The SOS attempts to justify the State's interest in opposing this relief "[p]resumably to limit the spread of COVID-19." Doc. 52 at 23. Certainly, setting the primary day for April 28 has increased the chances that in-person voting may occur at the height of the current crisis. Current projections indicate that delaying the primary until late May or early June may be wiser in that regard. In any event, the SOS's response ignores the realities of the current impact of the public health crisis on the postal system and the fact that an April 25 request deadline and an April 27 postmark deadline for absentee ballots creates a high probability that timely requests will not be honored in time, as can be seen in Plaintiffs' declarations and in the declarations of fact declarants. If the process were to run as smoothly as the State insists, Defendants should have no concern with this relief since the number of affected voters would be insubstantial. Such a safeguard is necessary to prevent voter disenfranchisement.

Relief Request: (6) An order mandating any elector will be permitted to cure any deficiencies in their provisional ballots or absentee ballot identification envelopes by mail, phone, or email up through the day prior to the day the official canvass is required to begin.

Again, ignoring the realities of the current public health crisis, the SOS sees no reason to extend the time for curing provisional ballots for even a short period of time. SOS Br. at 24. But Ohio law requires that provisional voters "appear at the office of the board of elections" to cure deficiencies in their provisional ballots. Ohio Rev. Code Ann. § 3509.181(B)(7). In addition, H.B. 197(F)(1) requires that absentee voters whose absentee ballots boards of elections deem "incomplete . . . shall provide the necessary information to the board of elections." The law does not clarify how a voter can provide this information without appearing at the board of elections. Under these extraordinary circumstances, there is no justification for the State's refusal to extend the time for cure.[22] For both absentee and provisional ballots, the current date for cure of absentee

---

[22] Further, there is no justification for prohibiting voters from curing their ballot by phone or email, particularly during a public health crisis. In suggesting alterations to the timeline and process set forth in

ballots cast for the election is May 5. H.B. 197(F)(1). Under the circumstances a short extension to allow voters to locate necessary material and travel or mail additional proof of identification to boards of elections is reasonable; and denying it is not

Relief Request: (7) An order mandating the conclusion of the 2020 primary election be set at such a time as will allow election officials to provide orderly notice to electors and administer the election in the manner provided for herein.

Not surprisingly, the Secretary puts up a half-hearted defense of the April 28 date. Doc 44. at 24–25. As noted in Plaintiffs' opening brief, both the Secretary and county election officials had told the General Assembly that an April 28 date was not feasible. Doc 4. at 4–5. Even now, SOS's own witness attests that it would be "logistically impossible . . . to send unsolicited absentee ballot applications to all 7.7 million registered voters" and suitably process those applications by April 28. Grandjean Decl., Doc. 44-2, ¶ 36. If the Secretary cannot feasibly provide a ballot to every registered voter by the statutory deadline—in other words, conduct an election in compliance with the U.S. Constitution—then that deadline must be moved.

The Ohio Democratic Party has claimed—even after the Democratic Party moved its Party Convention to August—that it must meet the June 20 deadline for state parties to certify their delegations to the Convention. *See* ODP Br. at 5, ECF No. 25-2. But the ODP's own 2020 Delegate Selection Plan expressly provides the ODP Chair the authority to change the schedule of the plan if the State of Ohio changes the date of the primary election. ODP Br. at 15, ECF No. 25-2 ("In the event that the State of Ohio changes the date of Ohio's Primary, the Chair of the Ohio Democratic Party is hereby granted the authority to change the dates within this plan to comply with State law."). Moreover, the DNC 2020 Delegate Selection Rules provide for a primary election to be held as late as June 9, 2020. DNC 2020 Delegate

---

H.B. 197, the Ohio Association of Election Officials stated: "Voters should be able to correct mistakes on their absentee ballot applications via email or telephone as opposed to the normal process." OAEO Letter, Doc. 4-5 at 2. There is no reason provided for why these same types of accommodations cannot be provided for voters needing to cure their ballots.

Selection Rules, Rule 12(A), at *12, https://democrats.org/wp-content/uploads/sites/2/2019/07/Regulations-of-the-RBC-for-the-2020-Convention-12.17.18-FINAL.pdf.

While the ODP argues its 47-day post-certification process means the election must be held on April 28, 2020 to comply with the DNC's June 20, 2020 deadline for selecting the state party's delegates, nowhere in their briefing do they justify why that schedule cannot be truncated given the extraordinary hardships faced by Ohio voters dealing with the COVID-19 public health emergency while trying to exercise their constitutionally protected right to vote. For example, the ODP's timeline for delegate selection includes 11 days allotted for PLEO's and at-large delegates to file their candidacy declarations with the ODP chair and nine days allotted for presidential campaigns to submit a list of committee candidates to the ODP chair. ODP Br. at 6, ECF No. 25-2. Moreover, at least three other states have moved the presidential primary election date itself either on or past the June 20, 2020 DNC deadline. At the time of this filing, neither Louisiana, whose primary is scheduled on June 20, nor Kentucky and New York, whose primaries are scheduled on June 23, have faced any repercussions for violating the DNC rules. Jonathan Easley, *DNC Calls on States Not to Postpone Primaries*, The Hill, Mar. 17, 2020, https://thehill.com/homenews/campaign/488111-dnc-calls-on-states-not-to-postpone-primaries; Stephanie Saul, *Cuomo Postpones New York's Primary Election to June 23 Because of Coronavirus*, N.Y. Times, Mar. 28, 2020, https://www.nytimes.com/2020/03/28/us/politics/ny-primary-voting-coronavirus.html In addition, to the best of Plaintiffs' knowledge, no state Democratic Party in the eight states that have postponed their primary elections to June has filed an action similar to ODP's demanding an earlier date citing difficulty selecting delegates to the, now delayed, convention."

Relief Request: (8) An order mandating Secretary LaRose to issue a directive notifying Ohio's eighty-eight county boards of elections of the aforementioned requirements; and to educate and inform electors about: the timeline and process for voting in the upcoming election; and that if they did not receive an absentee ballot in the mail they may contact their boards of elections and (a) confirm whether they have been sent a ballot, and (b) if they have not received a ballot, request a ballot by phone.

The SOS does not dispute his obligation to fully inform and educate the public as to changes in the voting process. This Court has had to order the Secretary of State to make sufficient communications to voters in the past. *See Ohio A. Phillip Randolph Inst. v. Husted*, 2016 WL 6093371, at *7–8 (S.D. Ohio Oct. 19, 2016). The SOS has not made sufficient communications to educate voters who are unfamiliar with the vote-by-mail process. Plaintiffs continue to field calls from voters who do not know how to request absentee ballots, who express confusion as to which address they must mail their ballots, and who express frustration because they remain uncertain as to the date of the election. Ex. 2, Suppl. Miller Decl. ¶¶ 2, 4. The SOS plans to send postcards to 7.7 million voters, but as discussed previously, are one postcard mailing and materials on the SOS's website sufficient to educate voters? The answer is "no". More time and better education would serve Ohioans best and help ensure an inclusive and fair election.

## III. THE REMAINING EQUITIES SUPPORT PLAINTIFFS' REQUEST FOR EMERGENCY RELIEF.

That the General Assembly has the "prerogative" to set Ohio's election schedule, State Br. at 20, does not immunize the State from liability for unconstitutional action. Plaintiffs do not ask this Court to "intrude upon the Ohio legislature's prerogative lightly." *Id.* Rather, Plaintiffs ask the Court to act with due circumspection and with respect for the General Assembly, on a record that overwhelmingly supports the threat to Plaintiffs' fundamental right to vote.

In this context, the Court can assess the various parties' reliance on *Purcell v. Gonzalez*, 549 U.S. 1 (2006), for the proposition that this Court must reject all relief for Ohio voters out of deference to the "status quo." The status quo for Ohio's primary election was to hold the election on March 17, 2020. That status quo has been wiped out by the COVID-19 public health emergency. A primary election on April 28, 2020 was *never* the status quo in Ohio prior to the global pandemic which we are now experiencing. Indeed, the April 28 date was first adopted *only one week ago* on

March 27, 2020, as part of a vital coronavirus relief bill, and in direct contravention of warnings of Ohio's Secretary of State and local elections officials that an April 28 date was completely unworkable.

*Purcell* in no way prevents relief in the current circumstances. *Purcell* declined to provide relief in Arizona's *2006* elections against application of a voter ID requirement that Arizona had adopted in *2004*, two years before plaintiffs filed suit. 549 U.S. at 2. After *Purcell*, many courts have granted pre-election relief in circumstances much more similar to those here. For example, in *Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012), the Sixth Circuit upheld relief granted shortly before the 2012 general election to ensure that ballots cast in the wrong precinct because of poll worker error could be corrected and counted.

Similarly, a recent decision responding to COVID-19 concerns in Wisconsin held that extension of the voter registration deadline was consistent with *Purcell*, noting that "it is apparent that some accommodation is necessary to preserve citizens' right to vote amidst this unprecedented public health crisis." *Democratic Nat'l Comm. v. Bostelmann*, 2020 U.S. Dist. LEXIS 48394, *24 (W.D. Wis. Mar. 20, 2020). The same court subsequently issued a preliminary injunction easing absentee balloting deadlines and procedures in order to protect the right to vote in the state's upcoming April 7 election. *Democratic Nat'l Comm. v. Bostelmann,* 2020 U.S. Dist LEXIS 57918 (E.D. Wis. Apr. 2, 2020). In *Georgia Coal. for the Peoples' Agenda, Inc. v. Deal*, the court extended the period for voter registration after a hurricane had prevented timely submission of voter registration applications, distinguishing *Purcell* and stating "the Court does not discount that the extension would present some administrative difficulty. However, those administrative hurdles pale in comparison to the physical, emotional, and financial strain Chatham County residents faced in the aftermath of Hurricane Matthew." 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016).

24

The Sixth Circuit has emphasized that it does not construe *Purcell* as having outlined "a categorically higher burden for Plaintiffs who move for relief soon before an election, and this Court has explicitly rejected such a notion. *A. Philip Randolph Inst. v. Husted*, 907 F. 3d 913, 918 (6th Cir. 2018), citing *Ohio Republican Party v. Brunner*, 544 F. 3d 711, 718 (6th Cir. 2008) (en banc). In fact, it is not unusual for a court to issue relief to protect the fundamental right to vote in the midst of an election cycle. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (ordering improvements to absentee balloting procedures shortly before 2018 general election), application for stay pending appeal denied sub nom. *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1274 (11th Cir. March 21, 2019) (Pryor, J., concurring) ("'A stay [of the relief ordered by the district court] would disenfranchise many eligible electors whose ballots were rejected' for a perceived signature mismatch even when they were eligible to vote. And public knowledge that legitimate votes were not counted due to no fault of the voters . . . would be harmful to the public's perception of the election's legitimacy." (citations omitted)); *Common Cause of Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1298-99 (N.D. Ga. 2018) (granting, twenty-two days before a scheduled runoff election, a temporary restraining order pushing back the certification of Georgia's 2018 general election due to concerns about counting provisional ballots, in spite of Defendant's claim that even a day of delay would have a "massive impact on every Georgia runoff election," and still recognizing "the State has a critically important interest in the orderly conduct of elections"); *Ga. Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (granting an emergency preliminary injunction four days before the 2018 general election providing voting opportunities for those flagged due to citizenship while "recogniz[ing] the administrative burden the Court's order may place on the Defendant, particularly this close to the election" and yet

finding the burden "is minimal compared to the potential loss of a right to vote altogether by a group of people").

Amicus Honest Elections points to cases in Florida and Arkansas in which courts denied requests for emergency relief with respect to absentee balloting. *Mays v. Thurston*, 2020 U.S. Dist. LEXIS 54498 (E.D. Ark. March 30, 2020); *Williams v. DeSantis,* Case No. 1:20-cv-67-RH-GRJ (N.D. Fla., Order, Mar. 17, 2020). These cases are inapposite. In *Mays*, the plaintiffs sought relief just two working days before the election; and in *Williams*, plaintiffs sought relief the day before the election. Here, the plaintiffs sought relief well before the newly scheduled April 28 election. Moreover, in none of the cases relied upon by opposing parties was the state's chief election official on record stating unequivocally that the election simply cannot be administered within the time set by the legislature [cite to exhibits]*,* which is the situation confronted by this Court.

Most important, the defending parties cannot rely on a doctrine that presumes a stable status quo in the circumstances here, where the defending parties themselves have upended the status quo in numerous ways as the election was unfolding. No matter how understandable the reasons, the status quo was upended when the March 17, 2020 election was cancelled on March 16, 2020, one day before it was scheduled to begin, and the Secretary rescheduled it for June 2, 2020. The legislature similarly upended the status quo when it countermanded both the March 17 and June 2 dates, and rescheduled the election for April 28, a date which all the officials responsible for actually running the election agreed would be impossible to meet. Under these unusual circumstances, it is untenable for any party to invoke the status quo, rather than seeking a solution that will protect the right to vote for as many eligible persons as possible while preserving the State's ability to conduct the election. The relief sought by Plaintiffs uniquely serves these twin goals and should be granted.

26

## CONCLUSION

For the reasons set forth above, and in Plaintiffs' opening brief, Plaintiffs respectfully request that this Court grant them the emergency relief they set forth in their proposed order.

Dated: April 3, 2020

Ezra D. Rosenberg (admitted *pro hac vice*)
Jon M. Greenbaum (admitted *pro hac vice*)
Pooja Chaudhuri (admitted *pro hac vice*)
Jacob Conarck (admitted *pro hac vice*)
Lawyers' Committee For Civil Rights Under Law
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
jconarck@lawyerscommittee.org

Freda J. Levenson (0045916)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 472-2220
flevenson@acluohio.org

Respectfully submitted,

/s/ Naila S. Awan_____
Naila S. Awan, Trial Attorney (0088147)
Brenda Wright*
Emerson Gordon-Marvin (admitted *pro hac vice*)
Dēmos
80 Broad St, 4th Floor
New York, NY 10004
(212) 485-6055
nawan@demos.org
bwright@demos.org
egordonmarvin@demos.org

Chiraag Bains (admitted *pro hac vice*)
Adam Lioz (admitted *pro hac vice*)
Dēmos
740 6th Street NW, 2nd Floor
Washington, DC 20001
(202) 864-2746
cbains@demos.org
alioz@demos.org

David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
 (614) 586-1972
dcarey@acluohio.org

*pro hac vice forthcoming*

*Attorneys for the Plaintiffs*

27

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify on the 3rd day of April, 2020, that the foregoing document was filed via this Court's CM/ECF system. Notice of this filing will be sent by operation of that system to all parties of record, who may access it through the Court's system.

/s/ Naila S. Awan
Naila S. Awan (0088147)

*Attorney for Plaintiffs*